**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE No. _____

WENDELL SMITH, individually and on
behalf of all others similarly situated,

     *Plaintiff*,

*v.*

IS3, INC., a Florida corporation,

     *Defendant*.

_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Wendell Smith ("Plaintiff" or "Smith") brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant iS3, Inc. ("Defendant" or "iS3"), seeking relief for injuries it caused to him and a putative class of similarly situated individuals through the deceptive design, marketing, and sale of its software products. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### NATURE OF THE ACTION

1.     iS3 is a company that develops software that it claims protects computers from viruses and other security threats. Unfortunately for consumers, iS3's methods of inducing consumers into buying its software, as well as the products themselves, are highly deceptive.

2.     As explained herein, iS3 designed the software at issue in this lawsuit— STOPzilla AntiVirus and STOPzilla AntiMalware (together, "STOPzilla")—to scare users into purchasing and continuing to use the products by falsely reporting harmful security threats on

1

their computers.

3.     To demonstrate STOPzilla's purported value, iS3 offers free "15-day trial" versions of the software. According to iS3's website, the free trial version of STOPzilla is "the same as the full registered version, except that it detects and blocks Spyware and other infections but does not remove these parasites."[1] An examination of the types of issues that STOPzilla reports as harmful "infections," however, demonstrates how the products defraud consumers.

4.     Normal computer usage causes the accumulation of certain innocuous files, such as "cookies,"[2] that are downloaded from the Internet. iS3 intentionally programmed STOPzilla to detect these files and report them as "infections" that require fixing, without conducting any credible assessment of the impact that they pose to a computer's security. In STOPzilla's trial version, messages ominously warn about the existence of these "infections" and advises that "to completely remove [the] threat[s] from your computer, you must upgrade your trial version by purchasing a valid activation key." After purchasing the full version of STOPzilla—priced between $19.95 and $49.95—the software continues to report harmless files as "infections."

5.     The effect of the above is that STOPzilla reports to virtually *every* user that harmful security threats are affecting their computer, and that the purchase of the full version is necessary to remove them. By continuing to report the files as infections after purchasing the full version, STOPzilla also tricks users into thinking that the software works as advertised (*i.e.*, that STOPzilla really eliminates security threats). But, as detailed herein, that's not actually the case.

6.     iS3 controls a sizeable market share of the personal computer ("PC") security

---

[1]     Trial Versions of STOPzilla,
http://download.stopzilla.com/docs/stopzilla/sz50help/Trial_Versions_of_STOPzilla.htm (last accessed Apr. 25, 2014).

[2]     Cookies are described in more detail in <u>Section II.B.1</u>, below.

software industry and holds itself out as a reputable market leader. Because the average consumer lacks the requisite technical expertise to understand the underlying functionality of STOPzilla, they trust iS3 to honestly and accurately detect and report security threats affecting their computers. iS3 betrayed that trust.

## PARTIES

7.      Plaintiff Wendell Smith is a natural person and citizen of the State of Texas.

8.      Defendant iS3, Inc. is a corporation existing under the laws of the State of Florida, with its headquarters and principal place of business located at 2200 NW Boca Raton Boulevard, Boca Raton, Florida 33431. Defendant conducts business throughout this District, the State of Florida, and the United States.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (a) at least one member of the putative Class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

10.     The Court has personal jurisdiction over Defendant because it is registered to conduct business in this District, maintains its headquarters and principal places of business in this District, conducts significant business transactions in this District, and the unlawful conduct alleged in the Complaint occurred in and emanated from this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District, maintains its headquarters and principal places of business in this District, and because the decisions resulting in the unlawful conducted alleged in this Complaint originated in and emanated from this District.

## FACTUAL BACKGROUND

**I.      A Brief Overview of iS3 and the STOPzilla Software.**

12.     Incorporated in 1991, iS3 is a privately owned company that develops computer security software. iS3's most popular software products are STOPzilla AntiMalware and STOPzilla AntiVirus. According to iS3, STOPzilla AntiMalware "Blocks, Detects, and Removes Malware[3]" using one of the "largest malware threat databases in the industry." STOPzilla AntiVirus allegedly functions the same as STOPzilla AntiMalware, except that it also blocks viruses.

13.     iS3 sells STOPzilla in two main ways. First, consumers may download a free "trial" version of the software from iS3's websites, or purchase the full version of STOPzilla there outright. Second, iS3 developed an "affiliate marketing" program where it partners with third parties to advertise the free and paid versions of STOPzilla.[4] These "affiliate marketers" profit when consumers upgrade from the free to full version of STOPzilla, or purchase the full version of STOPzilla after clicking on one of their advertisements. The full version of STOPzilla ranges in price between $19.95 and $49.95.

**II.     iS3 Engineered the Trial Version of STOPzilla to Deceive Consumers into Upgrading to the Full Version.**

14.     iS3 and its affiliates aggressively market the trial version of the STOPzilla software online as "free" software that will accurately scan for and detect viruses and malware on a consumer's PC. For instance, a consumer searching the World Wide Web for free PC

---

[3]      "Malware," short for "malicious software," is unwanted software installed without user consent and/or without user knowledge, such as viruses, worms, and Trojan horses. *Malware: What It Is and How to Help Protect Your Computer*, http://www.microsoft.com/security/resources/malware-whatis.aspx (last accessed Apr. 25, 2014).

[4]      *Affiliate Program*, http://www.stopzilla.com/affiliate-program/ (last accessed Apr. 25, 2014).

security software will likely encounter an advertisement for STOPzilla. (*See*, *e.g.*, <u>Figures 1 & 2</u>.)



(**Figure 1.**)

(**Figure 2.**)

15.      Clicking on an advertisement for STOPzilla directs the user to a website that lists the supposed benefits of downloading and using the trial version of STOPzilla. (*See* <u>Figure 3</u>.) For example, iS3 and its affiliates claim on their websites that STOPzilla "detects, blocks, and removes infections before they can attack your system and do damage" and "works to protect you from Viruses and Malware without slowing down your PC."

(**Figure 3.**)

16.      iS3 also claims that STOPzilla uses the "most extensive virus and malware databases in the industry" and that it "eliminates many threats that other products in the industry fail to detect." (*See* <u>Figure 4</u>.)



(**Figure 4.**)

17.     In reality, iS3 designed STOPzilla to invariably and falsely label files as "infections" to scare users into purchasing and continuing to use the software.

**A.     An overview of the functionality of the trial version of STOPzilla.**

18.     After a consumer downloads and installs the trial version of STOPzilla, the software automatically performs a "Quick Scan" to analyze the computer and detect and remove any "threats." (*See* Figure 5.)



(**Figure 5.**)

19.     Upon completion of the "Quick Scan," STOPzilla displays a large banner at the top of the user's screen warning "ACTION REQUIRED," "[t]he following threats were detected and need to be quarantined." (*See* Figure 6.) STOPzilla also reports the total number of problems detected and characterizes them as "threats." By way of example, after running STOPzilla's "Quick Scan" on a *brand new computer* preloaded with typical web browsing data,[5] the software

---

[5]     For this illustration, "typical web browsing data" refers to data accumulated as a result of navigating a web browser to each of the top 10 most popular websites. (*See Top Sites in the United States*, Alexa, www.alexa.com/topsites/countries/US (last accessed Apr. 25, 2014)).

reports that 13 "threats" need to be "quarantined." STOPzilla then presents the option to remove the "threats" by clicking a large button that reads "REPAIR NOW." (*See* Figure 6.)



(**Figure 6.**)

20.     However, clicking on the "REPAIR NOW" button doesn't really remove the reported "threats." Instead, clicking the button results in iS3 attempting to scare the user into purchasing the full version of STOPzilla to remove them. Figure 7 shows STOPzilla warning that "STOPzilla AVM has found an infection," but that the user "must upgrade" to "completely remove this threat from your computer."



(**Figure 7.**)

21.     In the trial version, STOPzilla also presents the user with a large red banner, several intimidating graphics, and text that reads, "WARNING, "STOPzilla has detected potential threats." (*See* <u>Figure 8.</u>) STOPzilla continues to display this page every time the software is subsequently opened—and only stops after the user has purchased the full version of the software to "repair" the reported threats.



(**<u>Figure 8.</u>**)

22.     If the user chooses to click the "BUY NOW" button displayed in <u>Figures 7 and 8</u>, STOPzilla navigates the user to an iS3 website. On the website, iS3 represents that the user needs to purchase a license for the full version of STOPzilla to "GET PROTECTED." (*See* <u>Figure 9</u>.) iS3 sells one year licenses for STOPzilla that cost between $19.95 and $49.95, and also offers options to purchase multi-year licenses and additional licenses to "protect" multiple computers.



(**Figure 9.**)

23.     Though STOPzilla purports to "protect" computers from threats, a closer analysis of the items reported by the software as "threats" reveals that they are often harmless files. iS3 designed the software to grossly mischaracterize the severity of these files in order to scare users into purchasing the full version of STOPzilla.

**B.     An examination of STOPzilla's functionality shows that the software falsely reports harmless files as "threats" and "infections."**

24.     By design, STOPzilla falsely detects and reports common files—called "cookies"—as "threats" and "infections" that need to be removed. Yet these classifications aren't substantiated by fact. Additionally, by designing STOPzilla to classify cookies as threats, iS3 ensures that the software will find threats on virtually every computer.

*1.     An explanation of cookies.*

25.     Cookies are small computer files that are generated by websites and stored on the website visitor's computer.[6] Websites use cookies to store useful information, such as usernames and preferences, to make interaction with their websites easier and more efficient.[7] For example,

---

[6]     1 Raymond T. Nimmer, *Information Law* § 8:57 (2013).

[7]     *Id.*

a website might store a user identifier (*i.e.*, a username) in a cookie so that it can recognize the user whenever he or she visits the site again.[8] Cookies can also be used for statistical and marketing purposes, like tracking the number of unique visitors to a website or by documenting how consumers navigate across the web.

26.     Cookies are ubiquitous on the web, and are used by most popular websites.[9] Importantly, cookies aren't considered to be "infections" by the PC security industry.

27.     Microsoft, one of the largest developers of computer software and the creator of the Windows operating system, maintains a "Safety & Security Center" website that educates users on PC security best practices. On its website, Microsoft states that "[w]hile it is possible to misuse a cookie in cases where there is personal data in it, *cookies by themselves are not malicious*."[10] (emphasis added).

28.     Likewise, Symantec Corporation—a leader in computer security and software— maintains security research centers around the world that provide regular analyses of PC security threats. Researchers at Symantec have said the following about the risks posed to a computer's security by cookies:

> Contrary to what some users may think, cookies are NOT inherently malicious or dangerous. If you run a scan and you find a tracking cookie, the tracking cookie does not represent a malware infection. These are low to minimal security issues.  We have seen many security companies and free "Spyware Removal Tools" emphasize detection of cookies, calling them Spyware and Trackware and stating that you are "infected", which is

---

[8]     *Id.*

[9]     *Usage Statistics of Cookies for Websites, April 2014*, http://w3techs.com/technologies/ details/ce-cookies/all/all (last accessed Apr. 25, 2014).

[10]    *What is a cookie?*, http://www.microsoft.com/security/resources/cookie-whatis.aspx (last accessed Apr. 25, 2014).

most unlikely to be the case.[11]

29.    To illustrate the point, even iS3 itself uses cookies. When a consumer visits one of its websites as a result of clicking on an affiliate marketer's advertisement, iS3 attempts to place a cookie onto the visitor's computer. iS3 relies on the cookie to track users who downloaded STOPzilla via an affiliate marketer, and if they ultimately upgrade to the full version of the software (or buy it outright), to pay the affiliate marketer for their services.[12] On its website, iS3 says that its cookies do not "interfere with the operation of [users'] computer[s]."[13]

30.    iS3 even says on its website that, "A cookie file is information that a Web site puts on your hard disk so that it can remember something about you at a later time"—"*Cookies are not inherently bad*."[14] (emphasis added.)

31.    This makes it all the more interesting that iS3 designed STOPzilla to *never* detect its own cookies as "infections," but to report countless others as security threats that require "repair."

**2.    *iS3 designed the trial version of STOPzilla to falsely report cookies as infections that need to be fixed.***

32.    Figure 6, reproduced on the following page, shows the trial version of STOPzilla warning about the detection of threats and infections that must be quarantined. However, further inspection below shows that these purported "threats" are nothing more than ordinary cookies

---

[11]    *Tracking Cookie Technical Details | Symantec*, http://www.symantec.com/security_response/writeup.jsp?docid=2006-080217-3524-99&tabid=2 (last accessed Apr. 25, 2014).

[12]    *Affiliate Program*, http://www.stopzilla.com/affiliate-program/ (last accessed Apr. 25, 2014).

[13]    *Privacy Policy | STOPzilla – Security Software by STOPzilla*, http://www.stopzilla.com/about/legal/w3c/privacy/ (last accessed Apr. 25, 2014).

[14]    *Setting BASIC OPTIONS*, http://download.stopzilla.com/docs/stopzilla/webhelp/Setting_BASIC_OPTIONS.htm (last accessed Apr. 25, 2014).

generated by some of the web's most popular sites. Even assuming that such cookies could potentially pose a threat to the PC's security, STOPzilla doesn't conduct any meaningful analysis of these files before labeling them as "infections."



(**Figure 6**, reproduced from Page 7.)

33.     In Figure 6, STOPzilla identifies 13 cookies and warns that "[t]he following threats were detected and need to be quarantined." Yet these files are really "third-party"[15] cookies from the ten most popular websites on the Internet. From this finding, it's apparent that rather than program STOPzilla to evaluate the security risk posed by individual cookies, iS3 engineered the software to classify commonplace third-party cookies as "infections." STOPzilla's assertion that these files "need to be quarantined" simply isn't true.

34.     To illustrate, and as explained in the previous section, iS3 uses cookies (including third-party cookies) for its *own* analytical purposes (*i.e.*, to track STOPzilla purchases). But

---

[15]     "Third-party" cookies are a type of cookie used by websites for advertisement and marketing purposes. *Cookies: frequently asked questions - Microsoft Windows Help*, http://windows.microsoft.com/en-us/windows/cookies-faq#1TC=windows-7 (last accessed Apr. 25, 2014.) They are harmless and are commonly generated by or for web advertisements. *Id.*

because it designed STOPzilla not to identify its own cookies as threats, iS3's cookies will never be "quarantined" or "repaired." iS3 even states that its cookies, which include third-party cookies, don't "interfere with the operation of [users'] computer[s]."[16]

35.     Furthermore, if what STOPzilla reports about cookies were true (*i.e.,* they represent credible security risks) iS3 could have easily programmed STOPzilla to prevent the accumulation of "infectious" cookies in the first place.[17] Tellingly, iS3 didn't design STOPzilla that way. Instead, the user's computer is allowed to acquire countless cookies generated by the web's most popular websites. This nearly guarantees that in later scans STOPzilla will always identify "threats" that need to be "quarantined"—thereby creating the appearance that the software works as advertised (*i.e.*, that it "continues to protect [users] from future threats). *See* Figure 5.

36.     In light of the above, it's evident why STOPzilla's design is so deceptive. Consider Figure 10 on the following page. The screen on the left shows the thirteen aforementioned cookies being reported by STOPzilla as "infections." On the right is the screen displayed after the user clicks "REPAIR NOW" to remove those "infections." Text on that screen reads: "STOPzilla AVM has found an infection … In order to completely remove this threat from your computer, you must upgrade your trial version by purchasing a valid activation key."

---

[16]     *Privacy Policy | STOPzilla – Security Software by STOPzilla*, http://www.stopzilla.com/about/legal/w3c/privacy/ (last accessed Apr. 25, 2014).

[17]     *Block or allow cookies*, http://windows.microsoft.com/en-us/windows-vista/block-or-allow-cookies (last accessed Apr. 25, 2014) (explaining how users can modify settings in the Internet Explorer web browser to "control the cookies that are stored on your computer.").

37.     In other words, iS3 programmed STOPzilla not only to report harmless cookies as infections, it also designed the software to claim that the existence of these files on a computer necessitates purchasing the full version of its software.



(**Figure 10.**)

38.     The result of these techniques is that STOPzilla users are tricked into buying the full version of the software based on falsely reported "infections." Similarly, after purchasing the full version, users are tricked into thinking that STOPzilla works because it continues to report newly acquired cookies—*e.g.*, cookies that result from visiting popular websites—as harmful threats.

## III.   iS3 Continues its Deceptive Practices in Disregard of the Changing Security Software Industry.

39.     Unfortunately for consumers, iS3 is not alone in its use of the sorts of fraudulent programmatic design and marketing practices at issue in this case. Rather, the security software industry has been fraught with these tactics for over a decade. It is only recently, however, that software developers—like iS3 and its competitors—have been called to account for profiting off consumers who are unable to pinpoint the fraudulent technological design and methods at issue.

40.     Indeed, numerous lawsuits have been filed against well-known competitors of iS3 (*e.g.*, Kaspersky Lab and AVG Technologies)—including several by Plaintiff's counsel here—which allege similar claims related to the fraudulent design and marketing of security software products. Several of those cases have resulted in classwide settlements and industry-shaping software modifications, which compel the implementation of far more transparent threat detection and reporting procedures.

41.     Rather than follow suit and make the changes necessary to ensure that its software truthfully detects, reports and removes harmful threats, iS3 has continued its unlawful business practices and profits from them to this day.

## IV.     <u>Plaintiff Smith's Experience.</u>

42.      In March of 2014, Plaintiff was surfing the web and was presented with a pop-up advertisement for STOPzilla AntiVirus with descriptions substantially similar to those depicted in <u>Figures 1–3</u> above.

43.     After clicking on the advertisement, Plaintiff was directed to one of Defendant's websites (http://www.stopzilla.com) and read express warranties about the software's utility, which were the same (or substantially similar to) the representations described in Paragraphs 15 and 16 above.

44.     Relying on these representations—namely, iS3's claim that STOPzilla "detects, blocks, and removes infections before they can attack your system and do damage" and "works to protect you from Viruses and Malware without slowing down your PC," Plaintiff downloaded the free trial version and then purchased the full version of the software for $39.95.

45.     Yet, the STOPzilla software that Plaintiff purchased did not—and could not—perform as advertised by iS3. In reality, iS3 designed the software to arbitrarily and invariably

falsely report infections as detailed in <u>Section II.B</u> above. As such, Plaintiff purchased the product under the falsely created belief that STOPzilla was capable of honestly and accurately assessing the condition of his computer and was otherwise able to remove harmful infections and security threats as promised.

46.     But for iS3's descriptions about STOPzilla's utility, Plaintiff would not have purchased and continued to use the software.

<strong>CLASS ALLEGATIONS</strong>

47.     **Class Definition**: Plaintiff Smith brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All individuals and entities in the United States that have purchased the STOPzilla AntiVirus or STOPzilla AntiMalware software.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released, and (5) the legal representatives, successors, or assigns of any such excluded person.

48.     **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but on information and belief, iS3 has sold its software to thousands of Class members throughout the country, making joinder of each individual member impracticable. Ultimately, Class members will be easily identified through iS3's records.

49.     **Commonality and Predominance**: There are many questions of law and fact

16

common to the claims of Plaintiff and the other putative Class members, and those questions

predominate over any questions that may affect individual members of the Class. Common

questions for the Class include but are not limited to the following:

a)   Whether Defendant intentionally designed STOPzilla to invariably report that harmful "infections" threaten a computer and require repair;

b)   Whether Defendant intentionally misrepresented the functionality of STOPzilla;

c)   Whether Defendant's conduct described herein constitutes fraudulent inducement;

d)   Whether Defendant's conduct described herein constitutes breach of contract; and

e)   Whether Defendant has been unjustly enriched as a result of its conduct described herein.

50.   **Typicality**: Plaintiff's claims are typical of the claims of other members of the

Class, in that Plaintiff and the other Class members sustained damages arising out of Defendant's

uniform wrongful conduct.

51.   **Adequate Representation**: Plaintiff will fairly and adequately represent and

protect the interests of the Class and has retained counsel competent and experienced in complex

class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no

defenses unique to Plaintiff.

52.   **Policies Generally Applicable to the Class**: This class action is appropriate for

certification because Defendant has acted or refused to act on grounds generally applicable to the

Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible

standards of conduct toward the members of the Class, and making final injunctive relief

appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply

and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on

Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to

Plaintiff. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered similar harm and damages as a result of Defendant's unlawful and wrongful conduct.

53.     **Superiority**: This class action is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

54.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned in discovery.

**<u>FIRST CAUSE OF ACTION</u>**
**Fraudulent Inducement**
**(On Behalf of Plaintiff and the Class)**

55.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

56.     As depicted with particularity in <u>Figures 1–4</u> and <u>Section II</u> above, and as described throughout this Complaint, iS3 has used, and continues to use, marketing tactics it

18

knows or reasonably should know are false and misleading.

57.     To induce Plaintiff and the Class into purchasing and/or continuing to use STOPzilla, iS3 affirmatively represented that STOPzilla provided a certain level of utility. Specifically, iS3 represented that STOPzilla would honestly and accurately scan consumers' PCs for threats and infections, remove those threats, protect their computers from future security threats, and otherwise perform the beneficial tasks depicted in Figures 1–4 and described in Section II and throughout this Complaint. Furthermore, through STOPzilla itself, iS3 affirmatively represented that Plaintiff and the Class's PC were infected with "threats" thus requiring them to either purchase or continue to use the full version of the software.

58.     iS3's affirmative representations in advertisements and in the STOPzilla software were, in fact, false. In particular, the threats depicted by iS3 do not—and cannot alone—pose a legitimate threat to Plaintiff's and the Class's PCs.

59.     The utility of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase and/or continue to use a product. Any deception or fraud related to the utility of a product is materially misleading.

60.     As STOPzilla's developer, iS3 knew that its representations about STOPzilla's utility were false. iS3 intentionally designed its public representations to mislead consumers about STOPzilla's utility and programmed both the free trial and full versions of the software to falsely report PC threats and to deceive users about their computers' true conditions.

61.     iS3 made these misrepresentations with the intent to induce Plaintiff and the Class to rely upon them by purchasing and/or continuing to use STOPzilla.

62.     As consumers lacking the requisite technical expertise to independently gauge

STOPzilla's underlying functionality, and taking iS3's statements at face value, Plaintiff and the Class justifiably relied upon iS3's misrepresentations by purchasing and continuing to use STOPzilla. They would not have purchased, nor continued to use, STOPzilla but for the misrepresentations that their PCs were in need of repair and that STOPzilla was capable of making such repairs.

63.     As a result of their reasonable reliance on iS3's misrepresentations, Plaintiff and the Class have been damaged in the amount of STOPzilla's purchase price (typically between $19.95 and $49.95), or at least a portion thereof.

64.     Plaintiff and the putative Class therefore pray for relief in the amount of the difference between the purchase price they paid for STOPzilla and its actual value. Plaintiff further alleges that iS3's conduct and misrepresentations were made with malice and in conscious disregard of Plaintiff's and the Class's rights, thereby entitling them to punitive damages against iS3 in an amount sufficient to deter such conduct in the future.

<u>SECOND CAUSE OF ACTION</u>
**Breach of Contract**
**(On behalf of Plaintiff and the Class)**

65.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

66.     Plaintiff and the members of the Class entered into agreements with iS3 whereby iS3 agreed to sell, and Plaintiff and the members of the Class agreed to purchase, STOPzilla, which would purportedly scan consumers' PCs for threats and infections, remove those threats, and protect their computers from security threats, as described more fully in <u>Section II</u> above. Based on the foregoing offer and representations, Plaintiff and the Class agreed to purchase STOPzilla.

67.     Plaintiff and the Class paid, and iS3 accepted, STOPzilla's purchase price

(typically between $19.95 and $49.95), and therefore performed their obligations under the contracts.

68.     As such, iS3 voluntarily assumed a contractual obligation to provide Plaintiff and the Class with software that would perform the benefits depicted in <u>Figures 1–4</u>, described in Paragraphs 15–18, and as otherwise described in <u>Section II</u> above, and that it would honestly scan consumers' PCs for threats and infections, remove those threats, and protect their computers from security threats.

69.     iS3 breached its contracts with Plaintiff and the Class by intentionally designing STOPzilla to mischaracterize and misrepresent the threats and infections identified by the software and further by failing to provide software that performed the tasks described in Paragraphs 15–18, and otherwise described in <u>Section II</u> above. These obligations were material terms of the agreements.

70.     iS3 did not honor these obligations, as STOPzilla could not credibly assess Plaintiff's and the Class's computers. That is, STOPzilla did not actually perform the beneficial tasks that it represented it would.

71.     The aforementioned breaches of contract have directly and proximately caused Plaintiff and the Class economic injuries and other damages, including in the form of the purchase price (or at least a portion thereof) of STOPzilla, because they purchased a product that does not perform as iS3 promised, and therefore lacks the utility contracted for.

**<u>THIRD CAUSE OF ACTION</u>**
**Unjust Enrichment**
***In the Alternative to Breach of Contract***
**(On behalf of Plaintiff and the Class)**

72.     Plaintiff incorporates the allegations in Paragraphs 1–64 as if fully set forth herein.

73.     Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant charged and collected from them for the purchase of the full version of the STOPzilla software, which did not and could not perform as iS3 promised.

74.     Defendant voluntarily accepted and retained the benefit conferred upon it by Plaintiff and the Class, and appreciates and/or has knowledge of the same.

75.     Under principles of equity and good conscience, Defendant should not be permitted to retain the monies belonging to Plaintiff and the Class that it unjustly received as a result of its wrongful conduct described herein.

76.     Accordingly, Plaintiff, on behalf of himself and the other members of the Class, seeks restitution and disgorgement of all amounts by which Defendant has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Smith, on behalf of himself and the Class, respectfully requests that this Court issue an Order:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Smith as representative of the Class, and appointing his counsel as Class Counsel;

B.     Declaring that iS3's actions, as set out above, constitute (i) fraudulent inducement, (ii) breach of contract, and (iii) unjust enrichment (in the alternative to breach of contract);

C.     Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*, an order (i) prohibiting iS3 from engaging in the wrongful and unlawful acts described herein, (ii) requiring iS3 to disclose and admit the

wrongful and unlawful acts described herein, and (iii) requiring iS3 to fully disclose the true nature of its software products in the future;

D.      Awarding damages to Plaintiff and the Class in an amount to be determined at trial;

E.      Awarding restitution to Plaintiff and the Class in an amount to be determined at trial, and disgorging all amounts by which Defendant has been unjustly enriched;

F.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

G.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

H.      Entering such other injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

I.      Awarding such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**WENDELL SMITH**, individually and on behalf of all others similarly situated,

Dated: May 26, 2014                    By: _/s/ Scott D. Owens_____
One of Plaintiff's Attorneys

Scott D. Owens (Florida Bar No. 597651)
scott@scottdowens.com
LAW OFFICE OF SCOTT D. OWENS, ESQ.
664 East Hallandale Beach Boulevard
Hallandale, Florida 33009
Tel: 954.589.0588
Fax: 954.337.0666

Benjamin H. Richman*
brichman@edelson.com
Courtney C. Booth*
cbooth@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro Hac Vice* admission to be sought.